### DORRANCE v. DORRANCE et al.*

(Circuit Court of Appeals, Eighth Circuit. January 6, 1920.)

No. 5252.

1. Descent and distribution ⬪71(6)—Proof that child held out as natural son was adopted must be clear.

To sustain a finding that a boy who had been for years held out by his family, including parents, grandparents, and other relatives, as the natural son of his parents, was an adopted son, the fact must be established, not simply by a preponderance of testimony, but by clear, convincing, and indubitable proof.

---

⬪For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
¹Rehearing denied September 6, 1920.

**2. Descent and distribution ⊛≈71(6)—Evidence held not to show that child was adopted.**

In a suit to quiet title to land claimed by defendant as the natural son of his father, evidence, consisting partly of documents from a foundling asylum and partly of testimony of witnesses and experts who had examined defendant's mother, *held* not to sustain a finding by the trial court, contrary to the master's finding, that defendant was an adopted child.

**3. Appeal and error ⊛≈1022(4)—That master, whose findings were reversed, saw witnesses, may be considered.**

That the master, whose findings were set aside by the trial court, heard and saw the witness who testified, cannot be disregarded on appeal from the decree entered by the court on its findings.

**4. Descent and distribution ⊛≈71(6)—In determining whether child is natural or adopted, welfare of parties may be given weight.**

A suit to quiet title, where the parties' rights depended on whether defendant was the natural or adopted child of his parents, can only be justly decided by giving due weight to the human relations of the parties and their welfare, as well as to the property rights involved.

**5. Evidence ⊛≈383(7)—Altered document not entitled to greater weight than oral testimony.**

While a document relating to a long past event, prepared by parties not affected by it, and not appearing to have been changed, has great probative force, one which shows on its face that it has been altered, and by a party affected thereby, is entitled to no greater weight than the oral testimony relating thereto.

Appeal from the District Court of the United States for the Eastern District of Missouri; John C. Pollock, Judge.

Suit by Benjamin Dorrance and others against Charles Francis Dorrance. Decree for complainants, and defendant appeals. Reversed, with directions to enter a decree for defendant.

Charles A. Houts, of St. Louis, Mo. (James A. Collet, of Salisbury, Mo., and Kenneth McC. De Weese, of Kansas City, Mo., on the brief), for appellant.

James C. Jones, of St. Louis, Mo., and Jules C. Rosenberger, of Kansas City, Mo. (Rollin E. Talbert, of Kansas City, Mo., on the brief), for appellees.

Before HOOK, Circuit Judge, and AMIDON and BOOTH, District Judges.

AMIDON, District Judge. This is a suit in equity brought by Benjamin Dorrance and the other heirs of Charles Dorrance, late of Luzerne county, Pa., asking a decree establishing their title to 1,000 acres of land in Chariton county, Mo., and to have it decreed that the defendant, Charles Francis Dorrance, has no right or interest therein. The land was left in trust by the will of Charles Dorrance, Sr., to the corporation referred to in the bill, to hold title thereof during the life of a son of the testator by the name of John Dorrance, and permit him either to use the land or to receive the income therefrom. Whether the defendant, Charles Francis Dorrance, is the owner of the land depends upon whether he is the son of said John Dorrance. The bill charges that he is not, but alleges that he was obtained from a found-

⊛≈For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ling asylum in St. Louis by John Dorrance and his wife, Emma, who were without children, for the purpose of palming him off upon Charles Dorrance, Sr., and the legitimate heirs of his estate. There are a multitude of collateral issues in the case which throw varying lights upon this primary question, but as both the master to whom the case was referred, and the trial judge, ruled that the case must turn upon the question of whether defendant is or is not the son of John Dorrance, we shall not need to pass upon these subordinate matters.

Charles Dorrance, Sr., was a man of large fortune and refined family. His son, John, was the black sheep of the flock. From early youth he showed a character of uncontrollable waywardness, which soon developed into such depravity as to be best explained upon the basis that he was periodically insane. He led a life of debauchery so revolting in many of its incidents that even the master declined to set forth the story in his report. Notwithstanding these periods, there were intervals in which he had the bearing of a gentleman, and obtained a standing and shared the acquaintance of the best citizens of the county in which the land here involved is situated, and upon which he made his home. He and his wife, Emma, were married in 1889, and at about that time took up their residence upon the land.

In 1891, in the month of February, John and Emma returned from St. Louis with an infant child, the defendant, Charles Francis Dorrance. They announced him as their son, born of the said Emma, and from that time on until 1907 both John and Emma held him out as their child, and he was recognized as such by the families of both his alleged father and mother, including the plaintiffs herein, and his grandfather and grandmother, Charles Dorrance, Sr., and wife, both orally and in writing, in ways so numerous as to establish his status as the son of John Dorrance. It is charged in the bill, however, that this was all the result of the fraudulent scheme formed by John and Emma for the purpose of palming off a spurious heir. The bill charges that the real facts in the matter were not discovered until 1907, when John became alienated from his wife, and told the story of the obtaining of the defendant from St. Ann's Orphan Asylum in the city of St. Louis. Upon this revelation the plaintiffs took certain proceedings in court for the purpose of perpetuating the testimony of witnesses claimed to be cognizant of the facts. Upon the death of John Dorrance in 1914 the bill was filed. It could not be filed before because the estate was held by John Dorrance during his life, with remainder over to the child or children of his body.

The pleadings have been frequently amended, so as to present the issue above described, and many collateral issues bearing thereon. The cause was then referred to a master to take the testimony and report his findings of fact and conclusions of law. The master filed an elaborate and scholarly report finding that the defendant was the son of John Dorrance, born unto him and the said Emma in lawful wedlock, and that he was the owner and entitled to the lands in controversy, and recommended that a decree be entered in accordance with these findings of fact and conclusions of law. Exceptions to the report were filed, and upon the hearing before the court the exceptions so

far as the basic matters above referred to are concerned were sustained, and a decree entered in favor of the plaintiffs in accordance with the prayer of the bill. The present appeal seeks a review of that decree.

While the cause was being heard below the court by stipulation of the parties, selected three physicians to examine the person of Emma Dorrance to ascertain and report whether in their opinion she had ever given birth to a child. They made the examination and reported that she had not, and this was one of the controlling factors in the court's decision.

[1, 2] The decision of the case turns wholly upon questions of fact. The law is well enough established. The status of husband and wife existed between John and Emma for at least two years prior to the time of defendant's birth, and the fact that defendant was for many years held out by them as their son, and so recognized in the community and by kindred in the manner above set forth, establishes his sonship and heirship. All the presumptions of the law are in his favor. The plaintiffs in order to prevail must establish the grave charges of their bill, not simply by a preponderance of testimony, but by proof that is clear, convincing, and indubitable. The master held that they failed to sustain this burden. The trial court held that they had done so. After the aid of very able arguments and briefs, and a painstaking study of the record, we are convinced that the decision of the master was right, and that the court erred in sustaining the exceptions and entering the decree here under review. In stating our reasons for this conclusion, we can only deal with matters of controlling importance. Any other course would involve the case in such a prolixity of detail as not only to obscure the real grounds of decision, but to extend the opinion beyond proper scope. As the case turns wholly upon questions of fact, it cannot serve as a judicial precedent, and there is really little advantage in an elaborate discussion of the evidence. Every such issue must be decided upon its own facts, and the facts of one case will be found to vary so much from another that a judicial opinion can afford little aid. As, however, there is a conflict between the decisions of the master and the trial court, it is fitting that we should state the salient reasons for the conclusions at which we have arrived. In doing so we are well aware that there is not a single proposition stated in the opinion as to which a multitude of circumstances cannot be set in array and cogent arguments made which to an interested mind seem to lead to a contrary conclusion. We are dealing with an event which at the time of the trial was concealed in the obscurity of a quarter of a century. It was further darkened by the insane and criminal conduct and speech of John Dorrance. He was so abnormal as to make it impossible to apply to anything connected with his life the ordinary reasoning which would apply to the life of a normal human being. Such a life, like the life of the insane, furnishes a fertile field for argumentation and for the arraying of circumstances leading to contrary inferences. As we said, all that a court can do in such a field is to state the reasons for its conclusions, and in performing that duty we are aware that none of those conclusions rest upon a basis so firm as to account

for all the facts disclosed by this record, or the inferences to which they give rise. It is also true that, in order to make the conclusions which we state intelligible to a third party, there would need to be an elaborate statement of facts. We do not deem this necessary. The opinion is written for the parties concerned and their counsel, who are already sufficiently familiar to understand a brief statement of our conclusions, and the reasons given therefor.

[**3, 4**] 1. The master heard and saw the witnesses. While that feature is not as important in this case as in some, we do not think it can be disregarded. In criticism of the master's opinion it is said that he was moved by considerations of sentiment. This lawsuit, however, involves human relations. It ought not to be decided without due weight to those factors. It cannot be wisely considered as a theorem in geometry would be solved, but can only be justly dealt with by giving proper weight to the welfare of the human beings whose interests are at stake, as well as to the property interests concerned.

2. The trial judge, in reversing the master, was largely influenced by the record evidence in the foundling asylum. As to that we make these observations: (a) The entry in regard to the adoption is devoid of significance, if the last column, headed "Remarks," "John Dorrence & wife" is eliminated. The origin of the entry is involved in the insane moral depravity of John Dorrance. The evidence shows that he had to do with the entry. He is shown to have possessed skill in palming off other women as his wife. By such an artifice he was able to get a notary to certify to the execution of a forged trust deed; the woman having used the name of Mrs. Dorrance and deceived the officer. This transaction was one of the causes that led to the rupture between himself and Emma Dorrance. To secure her execution of an instrument to protect him against a criminal prosecution for this forgery, he hit upon the fiendish device of threatening to make a record that would illegitimatize her child. He threatened to cause a record to be made in a foundling hospital that would lay the foundation for such a claim. With his experience in having successfully palmed off another woman upon the officer who took the acknowledgment of the forged deed, he had reason to believe that he could go to a foundling hospital, find there the entry of the adoption of a male child in 1891, then all he would have to do to make the record complete would be to state that he and his wife were the ones who had adopted the child years before, and that he desired to have the record show the fact. The evidence justifies the inference that the last column of the record was not filled out in 1891, but in 1899. After Mrs. Dorrance learned that that entry was made, and of the shadow it cast upon her life and the life of defendant, she was naturally concerned to have it corrected. She had a right to have it corrected, if it was put there in 1899 and was false. Her conduct in that regard is but the natural assertion of her legal and human rights. The report of the master on this record seems to us wise and fair. It is as follows:

"The entry 'John Dorrence & wife' plainly appears on the face of this record to have been written over an erasure. In the view I take of the case it will not be necessary to review in detail the evidence relating to the spo-

liated condition of the above entry. Let it suffice that, after a careful review and consideration of all the evidence heard upon this subject, I am not satisfied with the explanation made, nor am I able to find that the words, 'John Dorrence & wife,' or other equivalent words, were written or appeared on this record at the time the antecedent words 'Adopted February 28, 1891,' were entered. In my opinion it is not to be assumed, and there is no evidence to show that this record, as it was originally made and completed, contained any name whatever in the column of remarks showing who had 'adopted' the Grissel child; and in this connection it seems to me a matter of some significance that on this same page of the record two or three entries of 'adoption' occur without showing the name of the person adopting."

[5] When a written contract is prepared and signed by the parties as a memorial of their agreement, it is entitled to the praise expressed for documents in the numerous decisions cited and quoted from by counsel for appellees. But when the parties affected by a document have no part in its preparation, and it appears upon its face to have been changed and mutilated, it depends for its probative force wholly upon oral evidence. In such a case a document is entitled to no more credit than the oral evidence relating to it, and where that evidence is conflicting and unconvincing, as it is in this case, we are unable to attach to the document the probative force which the trial court gave to this mutilated and discredited record. It is not supported by a single consideration which has led courts to commend documents, as contrasted with the untrustworthiness of human memory, speaking of a long past event.

3. As to the entry in the account book, we think the criticism of the master is at least as reasonable as that of counsel for appellees. An inspection of it leaves the mind in serious doubt as to whether the parties to whom it relates are the parties concerned in this litigation.

4. The oral testimony of the Sister, upon which great reliance has been placed by appellees, is not convincing to us for these reasons: (a) It relates to a question of personal identity. That identity was never fixed until the issues involved in the present controversy had arisen. It was more than 10 years after the alleged adoption before the attention of the Sister Superior was called again to the matter. Considering the endless succession of persons similarly situated to those who left and those who took away the child in 1891, it is almost incredible that she could have had such a definite recollection as to be able to identify with certainty the persons who had to do with the child in February, 1891. Without any reflection upon her moral honesty, one needs only a slight knowledge of the power of suggestion, as that has been established by modern psychology, to know that the way her memory was first kindled on this subject by counsel representing appellees indicates that the Sister's memory may not be the expression of any present picture upon her own mind, but only a picture that was created by that suggestion. (b) The testimony of this Sister varies in important features as it is given in her last deposition from the testimony which was given in the proceeding to perpetuate testimony some years ago.

We are therefore unable to attach the weight, either to the records in the foundling asylum or to the testimony of the Sisters in respect

to those records, which the trial judge attached to them. They leave the matters in respect of which they speak, to say the least, no more than in equipoise, and thus, if the case were to be decided upon them alone, they fail to sustain the burden of convincing proof which rests upon the plaintiffs.

5. In our judgment the best foundation for the decision of the case lies in the physical facts existing in 1891, and testified to by disinterested and credible witnesses. If Emma Dorrance was pregnant in fact, that will carry us far in refuting the contention of plaintiffs that she and her husband entered into a fraudulent conspiracy to foist upon Charles Dorrance, the father, and the legitimate heirs, an illegitimate son. The evidence that Emma Dorrance was pregnant seems to us convincing: (a) Her own testimony upon the subject is clear and candid. (b) She is supported by testimony of Mrs. O'Riley and Mrs. Sasse, women who had borne many children, who had frequently performed the neighborhood service of midwife as that is practiced in country districts, and who, as the result of their own experience as mothers, and their experience as midwives, had accumulated a body of wisdom and insight which made their judgment trustworthy. They both had exceptional opportunities of observation in the case of Mrs. Dorrance. They attended to her needs in the last days of her pregnancy, and performed acts which brought her physical body under the immediate test of both their eyes and their hands, and they both testified with emphasis that she was pregnant. After she returned from St. Louis, Mrs. O'Riley continued for weeks to help her as she would have done in a country neighborhood with a young mother who had given birth to her first child. She testifies that Mrs. Dorrance had all the outward appearance of one who had been through such an experience. Among these may be mentioned: (a) Physical prostration and lassitude, and the facial and bodily appearance. It is impossible to describe the minutiæ which would go to form such a judgment, but, to one having the experience of Mrs. O'Riley, her judgment, based upon such a multitude of outward indicia, would be trustworthy, and ought to carry great weight. (b) Mrs. O'Riley testified that Mrs. Dorrance suffered from a caked breast and pains in it, and that she treated her for it, and felt of it, so that she knew the actual condition. This is a physical symptom which no skill in perpetrating a fraud could have induced. (c) Mrs. Dorrance for three months nursed the child and was its only source of sustenance. Mrs. O'Riley testified that she with her own hands placed the infant to Mrs. Dorrance's breast and observed it nurse.

These are all physical facts appealing directly to the senses, and of a character which it would seem to be impossible to simulate.

6. The testimony of Dr. Perkins: His standing as a surgeon and physician is unimpeached. He had Mrs. Dorrance under his medical attention in his hospital for months. The subject-matter of the treatment was such as to compel him to observe carefully the physical indicia bearing upon the question as to whether she had or had not given birth to a child. His testimony on the subject, and the record which was made at the time in the hospital, are clear and emphatic.

It is not a matter simply of observation, but he performed a surgical operation to remedy a tearing of the cervix of the uterus, which he states was of a nature that could not have been produced except by childbirth, unless it was deliberately produced by a surgeon. This experience with Dr. Perkins occurred in 1898 and 1899, within seven years after Mrs. Dorrance claims that she was confined and gave birth to the defendant.

Over against this testimony of Dr. Perkins stands the testimony of the three physicians appointed by the court to make a physical examination of Mrs. Dorrance. As to the testimony of these three physicians we make these observations: (a) Their examination was made 24 years after the birth of the child in question, when the evidence of the birth of the child, if the event actually occurred, would have become much less distinct than when Dr. Perkins had Mrs. Dorrance under his observation and treatment. (b) Dr. Perkins had by his surgery greatly changed the condition of Mrs. Dorrance's generative organs, so that the doctors appointed by the court were really not giving testimony which was the result of observing Mrs. Dorrance's condition, if she in fact did give birth to a child in 1891. The laceration of the uterus, which would have been the most trustworthy index of the birth, had without any question been removed by Dr. Perkins' surgery, so that about all the examining physicians had to guide them were the so-called striæ of the abdomen and the condition of the breasts. Even the doctors themselves testified that the changes of 25 years would greatly dim these symptoms. Dr. Perkins had also been compelled to remove both ovaries and the fallopian tubes in order to save Mrs. Dorrance from the results of venereal diseases with which she had been infected by her husband. These major operations must in the nature of things have so far changed the physical condition of Mrs. Dorrance as to greatly impair the testimony of the doctors appointed by the court. We therefore consider their evidence less trustworthy than the positive evidence given by Dr. Perkins as the result of his peculiar opportunities to know whereof he spoke.

These are, in our judgment, the controlling factors in the decision of the case. There are hundreds of minor circumstances tending both to confirm and refute these main features, and which could not even be stated without extending the opinion to lengths which we do not deem necessary. Our conclusion is that the master's report is sound, and rests upon a just and careful weighing of all the evidence in the case.

The decree of the trial court is therefore reversed, with directions to enter a decree in accordance with the findings and conclusions of the master.